In re Steve A. BUCKNER, Debtor.

In re John M. TUTTLE, Leona
J. Tuttle, Debtors.

John M. TUTTLE, Leona
J. Tuttle, Plaintiffs,

v.

UNITED STATES of America, Farmers Home Administration, Commodity Credit Corporation, Agriculture Stabilization and Conservation Service, Defendants.

Bankruptcy Nos. 90–42105–13, 93–40549–11.
Adversary No. 93–7189.

United States Bankruptcy Court,
D. Kansas.

July 8, 1997.

Jan Hamilton, Hamilton, Peterson & Keeshan, Topeka, KS, for Steve A. Buckner and John and Leona Tuttle.

Tim Larson, Larson & Schainost, Iola, KS, for Steve A. Buckner.

Jackie N. Williams, U.S. Attorney, Melanie D. Caro, Assistant U.S. Attorney, Topeka, KS, for U.S. and its various agencies.

## MEMORANDUM OF DECISION

### JAMES A. PUSATERI, Chief Judge.

The above-captioned bankruptcy cases and adversary proceeding are before the Court for resolution of the nature and extent of the interest of the United States in the debtors' rights in contracts under the Conservation Reserve Program. The Court has heard evidence and arguments and reviewed the relevant pleadings, and is now ready to rule.

### FACTS

*General Facts*

Debtor Steve Buckner and debtors John and Leona Tuttle entered into contracts with the government under the Conservation Reserve Program (CRP). The CRP was established mainly to encourage farmers to remove highly erodible land from use for growing crops or grazing livestock. *See 52 Fed 4265–66 (1987).* Upon entering land in the CRP, the owner and operator (hereafter "farmer") had to refrain for ten years from using it for production, and also had to perform conservation practices on it, such as planting and fertilizing trees or grasses to prevent erosion. *Id at 4272 (codified at 7 C.F.R. § 704.12(a)(1), (2), (5), (6), & (7) (1988)).* The farmer also was require to "reduce the aggregate total of crop acreage bases, allotments, and quotas" for his or her farm so that the CRP would replace a proportionate share of his production, and so reduce the production of surplus commodities. *Id. (codified at § 704.12(a)(3)).* In return, the government would pay the farmer a specified annual rental per acre of land in the program and also pay a share of the costs of the conservation practices. *Id. (codified at § 704.13).* The regulations governing the program remained largely unchanged from 1986 to 1990, *compare 52 Fed Reg 4265, 4269–75 (1987) (adopting initial final rule for CRP) with 7 C.F.R. Part 704 (1990),* so the Court assumes that Buckner's contract, the only one submitted as evidence, demonstrates the form lowed by all the contracts during that period. When new regulations were promulgated in 1991, the prior regulations continued to govern contracts previously formed. *56 Fed Reg. 15980, 15985 (1991) (codified at 7 C.F.R. § 704.1(c)).* The Commodity Credit Corporation (CCC) normally administered the CRP, but since it had no employees, the Secretary of Agriculture designated the Agricultural Stabilization and Conservation Service (ASCS) to run the CRP on the CCC's behalf. *United States Through Agr. Stabilization and Conservation v. Gerth,* 991 F.2d 1428, 1430 n. 1 (8th Cir.1993).

The first page Buckner's contract, which was submitted to the CCC in late February of 1987, included information about the specific contract, such as the name of the owner and operator of the land being entered in the program, some identification of the land involved, and the amount of the annual rental payment to be made. An eleven-page form appendix contained the bulk of the terms of the contract, while another attachment de-

scribed the unique conservation plan for the land being enrolled. Many of the provisions of the form appendix appear to repeat or paraphrase provisions of 7 C.F.R. Part 704, but for good measure, one provision expressly incorporates all those regulations by reference.

When the Buckner and Tuttle contracts were entered into, a farmer had to perform during one of the government's fiscal years and was paid during its next fiscal year. When Congress established the CRP in 1985, it provided that the Secretary of Agriculture could use the CCC's money during the fiscal years ending in September 1986 and 1987 to carry out the program, but could not use the CCC's money to carry out the program during later fiscal years unless Congress had appropriated money to the CCC for that purpose. *See 1985 U.S.C.C.A.N. (99 Stat.) 1514–15; 16 U.S.C.A. § 3841(a)(2) (1996).* Consequently, when Buckner's contract with the government was formed, the contract incorporated a regulation which read in pertinent part:

CCC shall, *subject to the availability of funds:*

(a) Share the cost with participants of establishing eligible conservation practices specified in the conservation plan ...; [and]

(b) Pay to the participant for a period of years not in excess of the contract period an annual rental payment in such amounts as may be specified in the CRP Contract.

*52 Fed.Reg. 4265, 427 (effective Feb. 6, 1987, codified at 7 C.F.R. § 704.13 (1988)), (emphasis added).* The "availability of funds" language had appeared in an earlier interim rule, *7 C.F.R. § 704.12 (1987),* and remained in the regulations until at least January 1, 1995. Congress amended 16 U.S.C.A. § 3841 in 1996, and omitted the appropriations limitation on the Secretary's ability to us CCC funds to pay for the CRP.

CRP contracts contain draconian provisions the government can invoke if a farmer fails to satisfy his or her CRP obligations. Paragraph 23 of Buckner's contract reads:

A(1) If he participant fails to carry out the terms and conditions of this Contract, CCC may ... terminate this Contract.

(2) If this Contract is terminated by CCC in accordance with this paragraph 23A, the participant shall:

(i) Forfeit all rights to further payments under this Contract and refund all payments received together with interest thereon as determined by CCC; or

(ii) Forfeit all rights to payments under this Contract and pay liquidated damages to CCC at the rate of 25 percent of the annual rental payment specified in item 6 of Form CRP–1 multiplied by the eligible acreage which was offered to be placed in the CRP if no payments have been received by the participant under this Contract.

(3) The purpose of the CRP is to control erosion on highly erodible lands thereby protecting the Nation's soil and water resources for succeeding generations. Once this Contract has been entered into between CCC and the participant, CCC and other segments of the agricultural community will act based on the assumption that the CRP Contract will be fulfilled and the reduction in erosion and production will be obtained. CCC's action includes budgeting and planning for the CRP in subsequent crop years. A participant's failure to carry out the terms and conditions of this Contract undermines the basis for these actions, damages the credibility of CCC's programs with other segments of the agricultural community, and requires additional expenditures in subsequent crop years in order for the required levels of acreage to be placed in the CRP and in order for an adequate reduction in erosion to be obtained. While the adverse effects on CCC of the participant's failure to comply with the terms and conditions of this Contract are apparent, it would be impossible to compute the actual damage suffered by CCC.

Therefore, upon the termination of this Contract in accordance with this para-

graph 23A, participant's [sic] to such contract shall be required to refund all payments received, together with interest, or to pay liquidated damages in an amount specified in paragraph 23A(2)(ii) if no payments have been made.

B CCC may, terminate a CRP Contract if the participant agrees to such termination and CCC determines that termination would be in the public interest.

C If the participants fail to carry out the terms and conditions of this Contract but CCC determines that such failure does not warrant termination of this Contract, CCC may require such participant [sic] to refund payments received under this Contract or to accept such adjustments in the payment as are determined to be appropriate by CCC.

*See also 52 Fed.Reg. 4265, 4274 (1987) (codified at 7 C.F.R. § 704.22 (1988)) (regulation on which these provisions are based).* Under these provisions, a farmer's potential liability to refund CRP payments would grow with each payment received.[1]

The government's request to set off Buckner's CRP payments originally came before the Court quite some time ago, and the Court decided the government could set off against the debtor's prepetition debt it a CRP payment that came due before the debtor filed for bankruptcy but not those that had or would come due after he filed. On appeal, the District Court reversed in part, concluding the government could set off CRP payments coming due postpetition. *In re Buckner*, 165 B.R. 942 (D.Kan.1994). That decision was appealed to the Tenth Circuit, but the appeal was dismissed as interlocutory because the District Court had remanded the case for consideration of the government's request for stay relief. The Tuttles' case was stayed pending the Buckner appeal.

Sometime after the Buckner case had been returned to this Court, a panel of the Tenth Circuit ruled that goverment agencies should be treated as separate entities for purposes of setoff, a ruling that meant CRP payments could not ordinarily be set off in bankruptcy under 11 U.S.C.A. § 553 because debtor-farmers usually owed debts to different agencies than the CCC. *Turner v. Small Business Administration (In re Turner)*, 59 F.3d 1041 (10th Cir.1995). The government obtained an *en banc* hearing in that case, so the Buckner and Tuttle cases remained in limbo until that decision was issued. The full Circuit reversed the panel decision and ruled the government should be considered a unitary creditor for purposes of setoff under § 553, at least in cases like these. *Turner*, 84 F.3d 1294 (10th Cir.1996).

Following the *en banc* decision, this Court held an evidentiary hearing in the Buckner case at which the government called two witnesses who testified about the workings of the CRP. The government agreed their testimony would be the same in the Tuttle case. The witnesses were Cathy Shields, a Farm Service Agency[2] credit specialist, and Roger Lemense, a Farm Service Agency conservation program specialist. Ms. Shields' testimony largely concerned only Buckner's particular circumstances, and Mr. Lemense gave most of the general explanation of the CRP. A summary of their testimony follows.

In one fiscal year the CRP program pays participating farmers for complying with their contractual obligations the previous fiscal year. The government does not absolutely owe any money unless the farmer finishes the year in compliance. Thus, the farmers earn the money on an annual basis by complying with their contracts. For all contract years after the fiscal year ending in 1987, no money was available to pay the farmers who complied unless Congress appropriated money to the CCC to do so. If a farmer breach-

---

1. Congress amended the program in 1996 to allow farmers to voluntarily terminate without penalty most CRP contracts that had been in effect for at least five years. *See Federal Agriculture Improvement and Reform Act of 1996, Pub.L. 104–127, § 331(c), 1996 U.S.C.C.A.N. (110 Stat.) 888, 994 (adding subsection e to 16 U.S.C.A. § 3835).*

2. After the events relevant to these cases occurred, Congress reorganized many, if not all, of the existing farm programs, and assigned many of them to new (or at least renamed) agencies. CCC and ASCS's duties under the CRP were transferred to the Farm Service Agency.

ed the contract, the government could terminate the contract and seek to recover any payments previously made. The possibility of termination is real, not illusory. Mr. Lemense was aware that over 1,000 CRP contracts had been terminated in Kansas for breach of contract, although some of them were later reinstated through a three-level appeal process. Since no money was due to a farmer until the government's fiscal year ended with the farmer in compliance, and since Congress did not make money available to pay on the contracts til the following fiscal year, neither the farmer nor any government agency exercising administrative setoff could obtain any money under the contracts until the farmer's annual performance had been completed. Farmers cannot draw any CRP money as an advance against their future performance.

Consequently, when the government sought to set off payments due to Buckner and the Tuttles after they filed for bankruptcy, the only payments that could have been absolutely owed and payable to the debtors were the payments funded by Congress but not yet paid to the debtors for the last full fiscal year before they filed for bankruptcy during which they had complied with their CRP contracts.

## FACTS PECULIAR TO THE BUCKNER CASE

In 1984, debtor Steve Buckner borrowed money from the Farmers Home Administration (FmHA), granting a mortgage on his home to secure the debt. In 1987, he entered into a ten-year CRP contract. He defaulted on the FmHA loan and in the summer of 1990, the FmHA notified the ASCS and Buckner that it wished to exercise an administrative offset of Buckner's CRP payments. Congress appropriated money to make CRP payments for the fiscal year ending in September 1990, so Buckner became entitled to a payment on October 1, 1990. After he filed for chapter 13 bankruptcy relief in November, the FmHA sought stay relief to allow it to set off that payment against its claim. A few months later, the FmHA sought stay relief to set off all future CRP payments Buckner would otherwise re-

ceive. The Court granted stay relief for the 1990 payment, but ruled the FmHA had no right to set off CRP payments Buckner would earn by postpetition performance of the CRP contract, and denied stay relief for future payments. According to a proof of claim the FmHA filed, Buckner owed it over $128,000 when he filed for bankruptcy.

The government appealed the denial of stay relief. Less than two months later, the FmHA reached an agreement with Buckner to value his home at $47,900 for purposes of his chapter 13 plan. Buckner had proposed a plan that, among other things, provided for him to assume the CRP contract and make payments toward the FmHA's mortgage with the payments he would receive under the contract. At the end of the plan, he was to refinance the home and pay the FmHA whatever it had not yet been paid of the $47,900 value. The government asked for a continuance of the hearing on confirmation of that plan until its appeal could be decided. The Court denied the continuance and the government asked for reconsideration. In an order denying that request, the Court indicated it would proceed with the hearing, saying,

> If confirmation is continued pending appeal and the district court affirms this court, then the confirmation question will remain to be resolved at that time. If confirmation is not continued, though, and the court determines the debtor's plan should be confirmed, the [government] could appeal that decision and ask to have its appeals consolidated. On the other hand, if the plan cannot be confirmed and the debtor cannot propose one that could be confirmed, the present appeal would become moot and could be dismissed.

The Court confirmed the plan at a hearing on June 28, 1991, and an order to that effect was entered in November. Despite the hint in the order denying continuance that it should do so, the government did not appeal the confirmation. On June 8, 1992, Buckner and the government submitted an agreed "modification" to the plan which repeats certain plan provisions and changes only the total amount of real property taxes to be paid, correcting an addition error.

As confirmed, the plan treated the FmHA as having a secured claim against Buckner only to the extent of the value of his home. Although a right of setoff gives a creditor a secured claim under 11 U.S.C.A. § 506(a), the government's claimed right to set off future CRP payments was not treated as increasing the amount of its secured claim. Consequently, the confirmation order negated the claimed right of setoff, and mooted the appeal about that right. Furthermore, in the subsequent "modification" to the government again acquiesced in applying the CRP payments to the FmHA's mortgage principal, not treating them as additional collateral. Nevertheless, it appears the parties did not advise the District Court of these developments, and the appeal culminated in an order reversing this Court's decision on setoff and remanding for consideration of the government's request for stay relief. By the time of the last hearing in this case, Buckner had completed his plan and the government's possible right to set off any of the CRP payments that funded the plan had become moot. However, the parties are now contesting the government's right to set off the CRP payment Buckner became entitled to receive late in 1996, after his plan was completed. Buckner has obtained an extension of his CRP contract for an eleventh year, but the government concedes it has no set off rights for that year.

## FACTS PECULIAR TO THE TUTTLE CASE

Debtors John and Leona Tuttle borrowed $47,000 from the FmHA in 1984, granting a second lien on their crops as security. In October 1989, the loan was re-scheduled for $60,685.88. In May 1989, the Tuttles had entered into a ten-year CRP contract, and were to receive their first payment in November 1990. Later, the Tuttles became delinquent on their debt to the FmHA, which accelerated the loan in October 1992. The FmHA then requested an administrative offset of the Tuttles' CRP payments, which was approved by the ASCS office in November 1992.

---

**3.** The facts stated in this paragraph reflect the sequence of events disclosed by a review of the

The Tuttles filed chapter 11 bankruptcy case on April 5, 1993, In December, they filed Adversary No. 93–7189, complaint for turnover and injunctive relief asking the Court to order the government to give them a CRP payment that was being withheld by the CCC and to make future CRP payments as they came due. In January 1994, the Court ruled the Tuttles could use the CRP money so long as they provided the FmHA with adequate protection in case its asserted setoff right was ultimately upheld. The Tuttles gave the FmHA a second mortgage on certain real estate as adequate protection. The FmHA filed a motion for stay relief that same month but later withdrew it. In March, the Court stayed the Tuttles' main case and their adversary proceeding pending a decision in the Buckner appeal. In April 1994, the FmHA again moved for stay relief; that motion is still pending. [3]

## DISCUSSION

*I. Setoff of Postpetition CRP Payments Under 11 U.S.C.A. § 553(a)*

 Section 553 of the Bankruptcy Code provides in pertinent part:

(a) Except as otherwise provided in this section and in sections 362 and 363 of this title, this title doe not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case.

The section does not create any new setoff rights, but merely preserves existing ones. *Citizens Citizens Bank of Maryland v. Strumpf,* 516 U.S. ——, ——, 116 S.Ct. 286, 289, 133 L.Ed.2d 258, 262 (1995); *5 Collier on Bankruptcy* ¶ 553.04 (Lawrence P. King, et al., eds., 15th ed. rev.1997). Even if a creditor has setoff rights, the automatic stay prevents "the setoff of any debt owing to the debtor that arose before the commencement of the case under this title." *11 U.S.C.A. § 362(a)(7).* Thus, the creditor must seek stay relief before exercising its setoff rights.

court files, rather than the somewhat different sequence described in the parties' stipulation.

In addition, with certain exceptions not relevant here, § 502(b) provides that claims are to be allowed as of the date of the filing of the petition, and 506(a) provides that an "allowed claim of a creditor ... that is subject to setoff under section 553 of this title, is a secured claim ... to the extent of the amount subject to setoff ... and is an unsecured claim to the extent that ... the amount so subject to setoff is less than the amount of such allowed claim." Nonbankruptcy law controls whether a debt that can be set off was owed to the debtor prior to the bankruptcy and what amount may be set off.

In these cases, the applicable nonbankruptcy law is found in 7 C.F.R. § 1403.7, governing administrative setoff of amounts payable by the CCC, among other things. Since 1989, § 1403.7(j)(1) has provided, in pertinent part: "Debts due any agency other than CCC shall be offset against amounts payable by CCC to a debtor when an agency of the U.S. Government has submitted a written request for offset which is mailed or hand-delivered to the appropriate [office]." *See 7 CFR § 1403.7(j)(1) (1997); 54 Fed.Reg. 52876, 52880 (1989).* Nothing in this regulation suggests an agency obtains any rights in the proceeds of a CRP contract before the CCC owes the other agency's debtor any money under the contract.

▇▇▇ Under § 553(a), for setoff to be available, the creditor must have a claim against the debtor and must owe a debt to the debtor. Such setoff is further limited to situations where both obligations arose before the debtor filed for bankruptcy, both obligations are between the same parties acting in the same capacity, and both obligations are valid and enforceable. *Davidovich v. Welton (In re Davidovich),* 901 F.2d 1533, 1537 (10th Cir.1990). In the present cases, there is no question that the government had prepetition claims against the debtors, and the Tenth Circuit's *en banc* decision in *Turner v. United States (In re G.S. Omni Corporation),* 835 F.2d 1317 (10th Cir.1987) has decreed that the FmHA and the CCC must be treated as one party under § 553.

The questions that remain to be answered in these cases are what debts the government owed the debtors and when it owed them. The evidence presented leads the Court to the following conclusions. The debtors signed contracts with the government which called for performance over ten-year periods, each year constituting an annual rental period. For each rental period, the government was not bound to pay unless the debtors fulfilled their obligations under the contracts and Congress, in its discretion, appropriated CRP funds to the CCC. If the debtors failed to perform, the government could terminate the contract and seek a refund of all previous payments. The Court sees no reason to doubt that the debtors could have ceased performing their obligations without penalty if the government had failed to pay them the annual rent. When the debtors led for bankruptcy, the CCC had no money to pay them any future rent but, at most, had money to pay them for their performance during the prior fiscal year. When the FmHA requested setoff, the CCC had no money to give it for future years. This point bears repeating: At the time the debtors filed for bankruptcy, the CCC could have had CRP money only to pay the debtors for performing in prior fiscal years and that only to the extent Congress had appropriated the money. Payments for subsequent years were not absolutely owing, due, or payable. Under these circumstances, the Court believes setoff is not available to the government on payments it would not be obliged to give the debtors until after they filed for bankruptcy. The regulations give the government a right of setoff but nothing appears to give the government a security interest in the debtors' rights under the CRP contracts.

Two decisions have generally been relied on by courts permitting the government to set off CRP payments debtors earn postpetition against prepetition claims of the government. The earlier one is *Moratzka v. United States (In re Matthieson),* 63 B.R. 56 (D.Minn.1986). That decision dealt with six bankruptcy cases involving contracts under the Federal Crop Deficiency Program for the 1984 growing season. *Id.* at 58. Farmers signing contracts to enroll in this program were required to take some of their land out of crop production and perform conservation

practices on it, to file reports showing compliance with the program, and to have their compliance evaluated by an ASCS committee. *Id.* In return, the government in essence guaranteed the farmers would receive at least a specific price for their crops, supplementing their receipts with deficiency payments if the end-of-the-year market price was too low. *Id.* Apparently, some advanced payments could be made in appropriate cases. *See id.* at 59–60. The debtors had all enrolled in the program but then filed for bankruptcy under chapter 7 before the deficiency payment due date. *Id.* at 58. The government sought stay relief to set off the deficiency payments against prepetition debts the debtors owed it, and the trustee for the cases contested its right to setoff *Id.* So when the debtors filed for bankruptcy, the guaranteed price had been fixed, but the size of their harvests and the end-of-the-year market prices were not yet known. The court ruled the government's obligations to pay the debtors existed prior to their bankruptcies, and its right to setoff was not affected by the fact the exact amount of its deficiency payment liabilities would not be determined until after the bankruptcy filings. *Id.* at 59. The court also rejected the trustee's claim that conditions precedent—the set-aside, soil-conservation, and report-filing requirements, and the determination that deficiencies existed-prevented the government's deficiency payment obligations from arising prepetition. *Id.* at 59–60. In sum, the court declared the government's obligation to pay the debtors arose on the signing of the contracts and was then absolutely owing and definite as to liability, but not yet due or liquidated.

The later case is *United States Through Agr. Stabilization and Conservation v. Gerth*, 991 F.2d 1428 (8th Cir.1993) *(2 to 1 decision)*, and it did involve a CRP contract. The majority opinion first agreed with *Matthieson* that a debtor-in-possession's assumption of an executory contract did not alter when the obligations under the contract arose *Id.* at 1431–33. As part of this analysis, the opinion referred to the often-stated principle that when assuming a contract, a debtor assumes all the contract's benefits and burdens. *Id.* at 1432. The opinion then turned to the question when the government's obligation to pay the debtor arose, noting that the creditor's obligation had to be " 'absolutely owed' " prepetition to be subject to setoff. *Id.* at 1433 *(quoting Braniff Airways, Inc., v. Exxon Co.,* 814 F.2d 1030, 1036 (5th Cir.1987))*.* Despite the Bankruptcy Code's definitions of "debt" and "claim" and the fact § 553(a) allows a creditor to offset only "a mutual debt" it owes the debtor against its own "claim" against the debtor, the opinion equated the words for purposes of its discussion of setoff under the statute. *Id.* The opinion next considered when all the transactions had occurred which were necessary for the government's obligation to pay the debtor to arise. *Id.* at 1433–35. The majority declared the debtor's right to payment arose when he signed the ten-year CRP contract and the contingency that Congress must appropriate the money to pay him each year did not change when that right arose. *Id.* at 1433–34. It then rejected the debtor's contention that his annual performance was a condition precedent to the government's payment, noting that contracts should be construed with a preference to finding mutual promises rather than conditions, citing the Restatement (Second) of Contracts, § 227(2) and comment d (1982). *Id.* at 1434. It said, "ASCS was bound by its promise when it entered the contract; [the debtor's] performance is not a condition for ASCS to be bound to its promise to pay. Therefore, his performance is not a necessary transaction for ASCS's liability to arise." *Id.* at 1435. Finally, the majority rejected the theory that the debtor's claim against the government for CRP payments was not mutual with the government's claim against him because the debtor and the debtor-in-possession were different entities for purposes of § 553. *Id.* at 1435–36. The District Court essentially adopted all of *Gerth's* reasoning in its decision in *Buckner. See* 165 B.R. at 946–47.

This Court finds several significant flaws in the *Gerth* majority's discussion. The first seems to be common to all the cases which reach a similar conclusion about setoff under § 553(a). The majority said, " 'Debt' should be read as being coextensive with the term

'claim.'" *Id.* at 1433. However, in § 553, Congress used "debt" to refer to the creditor's liability to the debtor and "claim" to refer to the debtor's obligation to the creditor. In § 101, "debt" is defined to be "liability on a claim;" § 101(12), and "claim" is defined to be "right to payment" or "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment" whether or not either of right "is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured," § 101(5). This Court believes the words "liability on" must add something to the meaning of "debt" that distinguishes it from "claim," and that something is the elimination of any contingencies, conditions, doubts, or disputes about the claim. Thus, although they have not necessarily expressed this reasoning, some courts have correctly specified that the creditor's debt to the debtor must be "absolutely owed" and "'all the transactions which gave rise to [the] debt occurred prior to the petition date.'" *Braniff Airways v. Exxon,* 814 F.2d at 1036 *(quoting In re Delta Energy Resources, Inc.,* 67 B.R. 8, 12 (Bankr.W.D.La. 1986)). Where postpetition events must occur before the creditor will be obliged to pay the debtor, that debt cannot be set off under § 553(a). The First Circuit recognized this facet of setoff in *Public Service Co. v. New Hampshire Electric Coop. (In re Public Service Co.),* 884 F.2d 11, 12–15 (1st Cir.1989), denying setoff when the creditor's claim against the debtor under a prepetition contract would be a prepetition claim only if the debtor rejected the contract postpetition.

In a different context, the Tenth Circuit has also recognized that the contingency of a claim can preclude its use for setoff. *FDIC v. Liberty Nat'l Bank & Trust Co.,* 806 F.2d 961 (10th Cir.1986). In a case about the insolvency of a bank, the Circuit indicated federal law controls the allowance of claims and the avoidance of preferences in such cases but does not specifically cover setoffs, so courts have looked to general equitable doctrines for principles underlying the right of setoff. The Circuit said, "[I]t appears to be the general rule that contingent claims are not a proper subject of setoff." *Id.* at 968. Then the Circuit held that banks whose rights to draw on letters of credit issued by the insolvent bank were fixed before the bank was declared insolvent were not "contingent" in that sense where the only event that had not yet happened was for the banks to demand payment. *Id.* at 968–69. However, one bank's rights under a standby letter of credit were "contingent" in the sense of the general rule and so not available for setoff, because that bank had to pay on a third party's demand before it would have the right to draw on the insolvent bank's obligation, and the third party did not make the demand until after insolvency was declared. *Id.* at 969–70. Nothing in the regulations governing the CRP or CCC and ASCS's operations seems to indicate the government's CRP payment obligations fall outside the general rule about setoff and contingency identified by the Tenth Circuit, so the *Liberty National* decision provides support for this Court's conclusion that at the time the debtors filed for bankruptcy, the government had no right to set off CRP payments the debtors would earn and Congress would fund postpetition.

The discussion of conditions and mutual promises in *Gerth* is also mistaken. Section 224 of the Restatement (Second) of Contracts (1981) states: "A condition is an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due." Although section 227(2) of the Restatement does indicate contracts should be construed with a preference to finding mutual promises rather than conditions, as the *Gerth* majority said, a later section declares that, with a limited exception not pertinent here, "[I]t is a condition of each party's remaining duties to render performances to be exchanged under an exchange of promises that there be no uncured material failure by the other party to render any such performance due at an earlier time." *Id. at § 237.* A review of the CRP contracts makes clear that the farmer must perform his obligations annually before the government must pay him or her (assuming Congress appropriates the money). The Restatement indicates, then, that even if all the events having impact on the parties' obli-

gations under the contracts should be construed to be mutual promises, the farmer's annual performance of his or her duties *is* a condition to the government's subsequent obligation to pay the annual rental payment for the relevant year. Consequently, the Court finds it difficult to understand how one can conclude that the ten years of payments called for by the CRP contracts were all "absolutely owing" as soon as the contracts were signed.

The result reached in *Gerth* seems flawed on two policy grounds as well. First, the CRP was created to encourage farmers to take marginal and highly erodible land out of production, and *Gerth* instead encourages those who file for bankruptcy to reject their CRP contracts and resume cultivating or grazing the land. At least in this Court's experience, farmers who file for bankruptcy ordinarily owe some government agency unsecured debts—often dischargeable ones—exceeding the payments they will be entitled to receive in the future under their CRP contracts, so *Gerth* would teach them to reject their CRP contracts to avoid having to perform their obligations only to see all the payments set off against their otherwise unsecured and dischargeable debts to government. Rejection of a CRP contract would probably be treated as a prepetition breach under 11 U.S.C.A. § 365(g)(1) that terminates the contract, and damages for the breach would, under § 502(g), simply add to the government's unsecured claim against the farmer. Second, if the government is entitled to set off all future CRP payments against its unsecured claim, debtor-farmers' chances of successfully reorganizing will be greatly diminished. Congress clearly intended in the Bankruptcy Code to encourage reorganizations, so it seems appropriate to resolve doubtful questions in favor of increasing debtors' chances of reorganizing. *See Gerth*, 991 F.2d at 1436–37 *(Heaney, J, dissenting) (under the majority's ruling, "[I]t will be difficult, if not impossible, for most grain farmers who run into financial difficulties to take advantage of Chapter 12 of the Bankruptcy Act to restructure their debt, an advantage that Congress intended that they should have.").*

For these reasons, the Court concludes the government may not set off CRP payments earned and funded postpetition against the prepetition debts Buckner and the Tuttles owe it.

## II. Law of the Case Doctrine in Buckner

■ At first blush, it might appear the law of the case doctrine would preclude the Court from applying in the Buckner case its conclusion about the government's claimed right of setoff. After all, the District Court's 1994 ruling reversed this Court's earlier decision reaching that same conclusion. However, for several reasons, the Court believes the doctrine should not apply under the circumstances. First and foremost, while its appeal was pending before the District Court, the government failed to appeal the order confirming Buckner's chapter 13 plan which treated it as a secured creditor only to the extent of the value of his home. Confirmation of that plan relied on this Court's prior ruling that the government had no right of setoff, and so was secured only by its mortgage on the debtor's home, not by postpetition CRP payments. Despite the indication in the Court's order denying continuance of the confirmation hearing that the government should appeal again if the Court confirmed Buckner's plan, the government chose not to do so, thus rendering its appeal moot once the confirmation order became final. *See 2 Keith M. Lundin, Chapter 13 Bankruptcy, § 6.9 at 6–7 (2d ed. 1994) ("The confirmation order is an order or judgment like any other: absent appeal, when it becomes final ... the confirmation order has all the normal preclusive effects of a final judgment from a federal court."); see also 11 U.S.C.A. § 1327(a) ("The provisions of a confirmed plan bind the debtor and each creditor ... whether or not such creditor has objected to, has accepted, or has rejected the plan."); Paul v. Monts*, 906 F.2d 1468, 1471 (10th Cir.1990) *(per curiam) (under § 1141(a), similar to § 1327(a), confirmed plan binds debtor, plan proponents, creditors and other parties in interest).* In the plan "modification" entered later, the government again acquiesced in the plan provision applying the CRP payments to the FmHA's mortgage principal, rather than treating them as

**56**

additional collateral. Furthermore, in the appeal, the record did not include the evidence later presented to this Court which clearly showed that except for the 1990 payment, no CRP money was available to be set off when Buckner filed for bankruptcy. Consequently, the Court believes it would be inappropriate to allow government now to rely on the preclusive effect the District Court's order would ordinarily have had.

*III. Conclusion*

The government may not set off against the debtors' prepetition debts to the FmHA those CRP payments which Buckner and the Tuttles earned and Congress funded after the debtors filed for bankruptcy.

The foregoing constitutes Findings of Fact and Conclusions of Law under Rule 7052 of the Federal Rules of Bankruptcy Procedure and Rule 52(a) of the Federal Rules of Civil Procedure. A judgment based on this ruling will be entered on a separate document as required by FRBP 9021 and FRCP 58.